William W. **SELLERS**, the Sellers Company, Inc. and Sellers Service, Inc., Appellants,

v.

**TIME, INC.**

No. 17917.

United States Court of Appeals, Third Circuit.

Argued Jan. 22, 1970.

Decided March 20, 1970.

Rehearing Denied April 24, 1970.

---

888

Henry T. Reath, Duane, Morris & Heckscher, Philadelphia, Pa., for appellants.

Philip H. Strubing, Pepper, Hamilton & Scheetz, Philadelphia, Pa. (Wilbur H. Haines, Jr., Philadelphia, Pa., Harold R. Medina, Jr., Edward O. Byrne, Cravath, Swaine & Moore, New York City, on the brief), for appellee.

Before FORMAN, SEITZ and ADAMS, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

This is a diversity action for libel based on Pennsylvania law. William Sellers appeals from an order of the district court granting summary judgment to defendant Time, Inc. and dismissing his complaint. Sellers brought this action alleging Time injured his reputa-

tion and those of his companies with an article appearing in TIME magazine.[1] At the time the article was published, Sellers was president and majority shareholder of Sellers Service, Inc. and The Sellers Company, Inc.

The allegedly offending article reported a decision in a negligence action in which Sellers was defending against a claim that he had negligently caused the loss of a companion's eye during a business-golf outing. It dealt with Sellers' unsuccessful motion for summary judgment which was grounded on the theory that the companion had assumed the risk of the accident.

Time personnel first learned of the decision from a report in 34 Law Week 2563. A Time stringer[2] in Philadelphia was detailed to investigate and forward a copy of the opinion to New York. Because of the unusual factual setting, Time considered the opinion newsworthy and assigned a writer and researcher to the article. They subsequently obtained further reports from the stringer in Philadelphia. The article was prepared in draft, circulated and rewritten several times, and checked for accuracy by the researcher. It was ultimately submitted to Time's top-level editors and to legal counsel all of whom approved it for publication. It appeared under the heading "Negligence" in The Law section and read as follows:

"Duffer's Dilemma

"William Sellers runs a heating-equipment company near Philadelphia, and he plays golf for business rather than pleasure. One June day in 1964, Sellers' game was running true to form at the Manufacturers Golf and Country Club in Oreland, Pa. At the third tee, his mind on a potential deal, Sellers hit the ball so awkwardly that it flew to the rear and struck one of his partners, James Walsh, sales manager of the tank division of Bethlehem

1. "Duffer's Dilemma," The Law, TIME, May 6, 1966 at 74.

2. The stringer was a full-time newspaperman who worked part-time for Time as a reporter on assignments in the Philadelphia area.

Steel in Dunellen, N. J. As a result, Walsh was blinded in his left eye.

"Since Sellers was working while golfing, Walsh sued both him and his company for $250,000, claiming that Sellers had negligently failed to wipe his hands before swinging, causing the club to slip. In answer, Sellers moved to have the suit dismissed on a seemingly unassailable ground: anyone who ventures on a golf course 'assumes the risk of being struck by a ball' and is thus barred from seeking damages.

"To everyone's surprise, Sellers' motion was shot down by Judge Alfred Luongo of the Philadelphia U. S. District Court, which had jurisdiction because Sellers and Walsh live in different states. Judge Luongo readily agreed that every golfer 'assumes the risk or is guilty of contributory negligence if he intentionally or carelessly walks ahead or stands within the orbit of the shot of a person playing behind him.' But when the ball struck Walsh, said the judge, he was sitting in a golf cart 20 ft. to Sellers' rear—a place of supposedly perfect safety. As a result, Walsh cannot be said to have 'voluntarily assumed the risk' of being partly blinded. Ruled the judge: Duffer-Defendant Sellers must stand trial."

In his complaint Sellers alleged that the article is replete with false, misleading, and flip statements which defame him and harm him and his corporations by diminishing their abilities to earn money. Time answered denying some portions of the complaint and pleading affirmative defenses. After discovery was completed, Time moved for summary judgment with supporting affidavits. The district judge granted the motion and dismissed the complaint.[3] He invoked three grounds for his decision. First he held that the article, "while in a flippant style, was unlikely to have effect on any average reader's impression of the plaintiff's character." Second he held that the article was privileged under the law of Pennsylvania. Last he held the article was privileged under the first amendment as interpreted in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Because a ruling on the privilege issues would only be necessary if the district judge erred in holding the article not capable of defamatory meaning, we shall consider Sellers' challenge to this holding first.

Sellers contends the district judge committed two errors in holding as he did on defamation. First he argues that the judge invaded the province of the jury by deciding the article was not defamatory whereas his proper function under Pennsylvania law was to determine whether the article was capable of a defamatory meaning. Sellers' statement of the law is accurate. See, e. g., Birl v. Philadelphia Electric Co., 402 Pa. 297, 167 A.2d 472 (1960); Boyer v. Pitt Pub. Co., 324 Pa. 154, 188 A. 203 (1936); Restatement Torts § 614 (1938). It is clear from the district court's opinion, however, that the court ruled that the article was not capable of a defamatory meaning.

Sellers' second contention is that the article is capable of a defamatory meaning under Pennsylvania law and, thus, it was error to summarily dismiss his complaint. In support of his contention, Sellers offers several innuendos explaining the defamatory meaning he ascribes to the article. His primary contention, as stated in his brief, is that the article gives the overall impression that he "is the sort of person who would risk grave injury to others because of his preoccupation with his selfish desire for material gain." As evidence that this impression results from a reading of the article, he cites several sentences and explains how they contributed to this overall impression. In judging the validity of Sellers' argument, we are, of course, not concerned with the accuracy of the

---

3. Sellers v. Time Inc., 299 F.Supp. 582 (E.D.Pa.1969).

TIME article but only with the likely impact on the average TIME reader.

■ Under Pennsylvania law innuendos may be used to explain in what manner the article is defamatory. The innuendos, however, must be "warranted, justified and supported by the publication." Moreover, they "cannot be used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear." Lastly, it is our duty, as it was the lower court's, "to determine whether the language used in the objectionable article could fairly and reasonably be construed to have the meaning imputed in the innuendo[s]." Sarkees v. Warner-West Corporation, 349 Pa. 365, 367, 37 A.2d 544, 546 (1944).

Turning now to Sellers' specific contentions, there are three sections of the article he points to in support of his thesis. He complains the statement "He plays golf for business rather than pleasure" depicts him as a "crass, materialistic, wheeler-dealer businessman who cannot forget business for even a few hours on the golf course." He further complains that the sentence implies he uses golf rather than "more forthright" means of obtaining business.

Sellers presumably intends these innuendos to support his contention that the article as a whole portrays him as one for whom business success overrides all concerns for others. Yet the statement is limited to one activity—golf. There is no indication of how frequently he plays. Moreover, as the district judge properly noted, business golf is neither shocking nor shameful to the average reader of TIME. Indeed, it is a commonplace practice among professional men and politicians, as well as businessmen. For these reasons, we conclude that a Pennsylvania court would reject these innuendos according to the teaching of Sarkees v. Warner-West.

Sellers also complains that the statement, "Sellers' game was running true

to form," implies either that he always plays golf awkwardly, that he always carries on business when on the golf course, or that the resultant accident was predictable from his customary course of conduct. As to the first two alternatives, we do not believe they ascribe a defamatory meaning to the statement. The last alternative is equally unhelpful because it suggests that TIME's readers could believe that an impossible shot to the rear was predictable. Such a belief would be so unreasonable that we do not believe it would be a possible inference for the reader to draw. These innuendos are equally unacceptable under the Sarkees rules.

Sellers' primary complaint centers on the following excerpt from the article:

> "At the third tee, *his mind on a potential deal*, Sellers hit the ball so awkwardly that it flew to the rear and struck one of his partners, James Walsh * * *. As a result, Walsh was blinded in his left eye." (emphasis added)

Sellers claims that these statements in effect say that had he been concentrating properly the accident would not have occurred. The district court concluded that such an accusation would not amount to defamation because it is not actionable to portray a man as the perpetrator of a single careless act.[4] We do not believe it is necessary to go so far, especially in the absence of any Pennsylvania case adopting such a rule.

As was noted previously, we do not think the first two excerpts considered support Sellers' claim that his portrayal in the article would cause the reader to believe him to be an overly materialistic or a crass man. Nor do we find that they contribute to the capacity for defamatory meaning of the excerpt last quoted.

Under Pennsylvania law a key factor is the nature of the audience reached by the publication. Because of the posture of this case, the record does not contain

4. *Id.* at 586.

any evidence of what TIME's readership was. Sellers asserts in his brief, however, that the "average reader of Time Magazine is far more sophisticated and intelligent than 'any average reader.'" Sellers contends that the high level of sophistication of the readership increases the article's capacity for defamatory meaning. Since Time does not contest this definition of its readership, we will accept it for the purpose of defining the average TIME reader. Our inquiry now must focus on the impact of the publication on the average reader of TIME. Boyer v. Pitt Pub. Co., 324 Pa. 154, 188 A. 203 (1936).

The article states that Sellers hit an awkward shot because he had his mind on a potential deal. In our view TIME's readership would not think less of Sellers because of such a portrayal. We say this because we believe TIME's readers are probably conversant enough with golf and/or golf stories to recognize the commonplace nature of such events. Moreover, as the district judge noted, playing golf for business rather than pleasure is also commonplace enough not to offend the average TIME reader's sense of propriety.

The ultimate question is whether the tragic result of these commonplace events imports a defamatory capacity to the otherwise legally unobjectionable article. We believe that the average TIME reader would recognize that the author of the "impossible" shot could not have foreseen its occurrence or consequences. We believe it likely that the fortuity of the events would be more likely to give rise to sympathy rather than disgust in the average TIME reader. Moreover, the flippant style of the article would, in our view, dilute the impact of the tragic shot in the minds of the readers. While the article may have caused Sellers great personal annoyance, annoyance alone does not constitute defamation. Scott-Taylor, Inc. v. Stokes, 425 Pa. 426, 229 A.2d 733 (1967).

In light of our disposition of the issue of the article's capacity for defamatory meaning, it is not necessary for us to reach the issues of privilege. For the same reason Sellers' claims relating to the scope of discovery need not be considered.

The judgment of the district court will be affirmed.